

Elizabeth J. Cabraser (State Bar No. 83151, ecabraser@lchb.com)
Richard M. Heimann (State Bar No. 063607, rheimann@lchb.com)
Heather A. Foster (State Bar No. 184353, hfoster@lchb.com)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Attorneys for Plaintiffs

*Additional plaintiffs' counsel listed on signature page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JONATHON LEE BOUTSIKARIS, a resident of Troy, County of
Michigan,

        Plaintiff,

v.

BAYER CORPORATION, an Indiana corporation,
successor to CUTTER BIOLOGICAL, a California
Corporation; BAXTER HEALTHCARE
CORPORATION, a Delaware corporation, and its
HYLAND DIVISION; ARMOUR PHARMACEUTICAL
COMPANY, INC., a Delaware corporation and ALPHA
THERAPEUTIC CORPORATION, a California
corporation,

        Defendants.



C 07 2595

COMPLAINT FOR
DAMAGES AND
INJUNCTIVE RELIEF

Jury Trial Demanded

(1) Negligence
(2) Negligence Per Se
(3) Fraudulent Omission and
    Concealment
(4) Breach of Implied Warranty

## I.  INTRODUCTION

1.  Defendants manufactured blood products known as "Factor VIII" and "Factor IX" for the treatment of hemophilia, and sold these products to people with hemophilia in the United States and worldwide, despite knowledge that the products were manufactured from sick, high-risk donors and/or known to be contaminated with the virus that causes Non-A, Non-B Hepatitis  (now known as "Hepatitis C" or "HCV").  Defendants knowingly declined to timely pursue or adopt treatment and manufacturing practices that would have prevented the infection of Plaintiff with HCV, as described in more detail below.  Defendants also continued selling old stocks of products they knew to be contaminated with HCV even after they or others had

1    introduced safer products. Plaintiff is a person with hemophilia who contracted HCV through use

2    of Defendants' contaminated products. This complaint describes the factual predicate for

3    Plaintiff's infection: a pattern of foot-dragging, denial, and obfuscation by the pharmaceutical

4    companies on whom his health and well-being depended.

5              2.    Defendants manufactured HCV-contaminated blood factor products using

6    human plasma taken from thousands of paid donors, including populations then known to be at

7    high risk of carrying blood-borne diseases, such as urban homosexuals, prisoners, and intravenous

8    drug users. Defendants intentionally recruited urban homosexuals who had a history of viral

9    hepatitis as plasma donors, despite regulations prohibiting the use of such donors and despite

10   knowledge that the virus that causes HCV was a blood-borne disease prevalent in such

11   populations. Defendants continued using plasma taken from high-risk prison donors, even after

12   promising the FDA that they would cease doing so. Through their trade associations, Defendants

13   actively conspired to conceal these practices and to substantially delay product recalls and

14   implementation of safety measures.

15             3.    Defendants failed to fully and completely disclose the known risks of their

16   products, including the risk of HCV; failed to implement readily available screening tests that

17   would have prevented HCV by excluding contaminated plasma; failed to use available methods

18   of treating plasma to kill viruses, including treatment with solvents and/or detergents; and

19   concealed and affirmatively misrepresented the extent of the health dangers of the diseases caused

20   by the products. Defendants also continued to sell old stocks of product that had not been treated

21   even after introducing a safer treated product, including stocks that Defendants knew or had

22   reason to know were made from pooled blood contaminated with HCV.

23             4.    Defendants' efforts to maximize profits came at the expense of the health

24   and lives of thousands of people with hemophilia in the United States and worldwide who were

25   needlessly infected with HCV, including JONATHON LEE BOUTSIKARIS.

26

27

28

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

## II.    JURISDICTION AND VENUE

5.    Plaintiff alleges an amount in controversy in excess of $75,000, exclusive of interest and costs. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants.

6.    Plaintiff is informed and believes and on such information and belief alleges that the conduct by Defendants that is relevant to the subject matter of this action took place primarily in their respective headquarters location and in other facilities within the States of California and Illinois, giving these states significant contacts to the claims asserted by Plaintiff and creating state interests such that the choice of either or each of these states' laws to govern the adjudication of this action is neither arbitrary nor fundamentally unfair.

## III.    PARTIES

7.    Plaintiff JONATHON LEE BOUTSIKARIS, a resident of Troy, Michigan who has hemophilia and was infected with HCV as a result of infusing Defendants' contaminated factor concentrate and/or as a result of Defendants' conspiracy. Plaintiff has already provided Defendants with a confidential Preliminary Patient Profile Form ("PPPF"), with beginning Bates number L-PPF 001909. The PPPF contains substantial additional information regarding Plaintiff's claim.

8.    Plaintiff suffers from serious injuries and diseases, including HCV and associated symptoms, as a direct and proximate result of use of Defendants' blood products and Defendants' conspiracy.

9.    Plaintiff would not have chosen to be treated with Defendants' blood products had he known of or been informed by Defendants of the true risks of using those products or the nature of the sources of the products.

10.    Defendant CUTTER BIOLOGICAL ("CUTTER"), the predecessor of Miles, Inc., and Defendant BAYER, was a California corporation headquartered in Berkeley, California at all pertinent times. At all pertinent times CUTTER and its successors Miles, Inc. and BAYER regularly and systematically engaged in the harvesting and collection of human plasma and the processing, manufacturing, marketing, sales and distribution of factor

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1 concentrates produced from such plasma, to which Plaintiff was exposed and which contributed

2 directly or indirectly to Plaintiff's infection with HCV.

3         11.    Defendant BAYER CORPORATION ("BAYER"), formerly Miles, Inc., is

4 and was an Indiana corporation, authorized to do business in all 50 states and the District of

5 Columbia. Miles, Inc. had its principal place of business operation in Elkhart, Indiana, while its

6 successor BAYER has its principal place of business in Pennsylvania, with offices located at 100

7 BAYER Road, Pittsburgh, Pennsylvania 15205. At all pertinent times BAYER and its

8 predecessors Miles, Inc., and CUTTER regularly and systematically engaged in the harvesting

9 and collection of human plasma and the processing, manufacturing, marketing, sales and

10 distribution of factor concentrates produced from such plasma, to which Plaintiff was exposed

11 and which contributed directly or indirectly to Plaintiff's infection with HCV.

12         12.    Defendant BAXTER HEALTHCARE CORPORATION ("BAXTER") is a

13 Delaware corporation, authorized to do business in all 50 states and the District of Columbia, with

14 its principal place of business in Illinois, with offices located at One Baxter Parkway, Deerfield,

15 Illinois 60015. At all times pertinent, Defendant BAXTER, and/or its HYLAND DIVISION, had

16 its main manufacturing plant in Glendale, California. At all times pertinent, Defendant

17 BAXTER, and/or its HYLAND DIVISION, and/or its wholly owned subsidiaries Travenol

18 Laboratories, regularly and systematically engaged in the harvesting and collection of human

19 plasma and the processing, manufacturing, marketing, sale and distribution of FACTOR

20 CONCENTRATE products produced from such plasma, to which Plaintiff was exposed and

21 which contributed directly or indirectly to Plaintiff's infection with HCV.

22         13.    Defendant ARMOUR PHARMACEUTICAL COMPANY, INC.

23 ("ARMOUR") is a Delaware corporation, with its principal place of business in Pennsylvania,

24 with offices located at 500 Arcola Road, P.O. Box 1200, Collegeville, Pennsylvania, 19426-0107.

25 At all times pertinent, ARMOUR regularly and systematically engaged in the harvesting and

26 collection of human plasma and the processing, manufacturing, marketing, sales and distribution

27 of factor concentrate products produced from such plasma, to which Plaintiff was exposed and

28 which contributed directly or indirectly to Plaintiff's infection with HCV.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1

2          14.    Defendant ALPHA THERAPEUTIC CORPORATION ("ALPHA") is a

3   California corporation, with its principal place of business in California, with offices at 5555

4   Valley Boulevard, Los Angeles, California 90032.  At all times pertinent, Defendant has been

5   regularly and systematically engaged in the harvesting and collection of human plasma, and the

6   processing, manufacturing, marketing, sale and distribution of factor concentrate products

7   produced from such plasma, to which Plaintiff was exposed and which contributed directly or

8   indirectly to Plaintiff's infection with HCV.

9          15.    Defendants CUTTER, BAXTER, ARMOUR and ALPHA (hereinafter

10  collectively referred to as "Defendants"), acting on behalf of themselves and/or their predecessor

11  and/or successor corporations, collected, harvested and/or processed human plasma and/or

12  manufactured, marketed, sold and distributed factor concentrate products that were contaminated

13  with HCV.  In the alternative, one or more of said Defendants participated in the collection,

14  harvesting and/or processing of human plasma, and/or the manufacturing, marketing, distribution

15  and sale of factor concentrate products, that were contaminated with HCV; or assumed or became

16  responsible for, the liabilities of the Defendants and their predecessor or successor corporations

17  who did participate in the collection, harvesting and/or processing of human plasma, and/or the

18  manufacturing, marketing, distribution or sale of factor concentrate products, that were

19  contaminated with HCV, without limitation thereto.

20          16.    At all times herein mentioned, Defendants were fully informed of the

21  actions of their agents and employees, and thereafter no officer, director or managing agent of

22  Defendants repudiated those actions, which failure to repudiate constituted adoption and approval

23  of said actions, and Defendants thereby ratified those actions.

24  **IV.    FACTUAL ALLEGATIONS**

25       **A.    Hemophilia and Its Treatment**

26          17.    Hemophilia is an inherited condition that causes uncontrolled

27  hemorrhaging or bleeding.  Hemophilia results from a deficiency of blood components essential

28  for coagulation.  The most common form of the disease is hemophilia A, characterized by a lack

1    of a blood protein known as Factor VIII, which affects approximately one in 10,000 males.

2    Factor VIII is commonly called "AHF" or anti-hemophilic factor.  Hemophilia B is characterized

3    by absence of another blood protein, known as Factor IX, affecting about one in 40,000 males.

4    Plaintiff JONATHON LEE BOUTSIKARIS has mild hemophilia A.

5          18.    The treatment of hemophilia involves intravenous introduction, called

6    infusion, of the missing blood proteins required to stop bleeding.  The two most prevalent forms

7    of such treatment are cryoprecipitate and factor concentrates.  Factor concentrates are the

8    products made by Defendants in this action.  Cryoprecipitate is made by freezing plasma, the

9    fluid component of circulating blood in which various proteins, including Factor VIII and

10   Factor IX, are contained; thawing the frozen plasma; and isolating Factor VIII from the plasma

11   through centrifugal concentration.  Cryoprecipitate is an effective therapeutic agent for patients

12   with hemophilia A.  Hemophilia B has been effectively treated with the use of fresh frozen

13   plasma containing Factor IX.  Cryoprecipitate and fresh frozen plasma are made from small

14   numbers of donors, who are generally unpaid volunteers.

15         19.    In the late 1960s to early 1970s, Defendants began to market factor

16   concentrates, which contained Factor VIII and Factor IX in higher concentrations than had been

17   available in either cryoprecipitate or fresh-frozen plasma.  To produce factor concentrates,

18   Defendants mixed pools of plasma from five to over twenty thousand donors at a time, a large

19   percentage of which were paid donors.  These large pools were then subjected to processes to

20   concentrate Factors VIII and IX.

21

22   **B.**    **Defendants Failed to Disclose or Warn of Serious Adverse Effects Associated with Factor Concentrates**

23         20.    Shortly after the initial commercial marketing of Factor VIII and IX

24   concentrates in the late 1960s to early 1970s, a wide range of serious adverse effects were

25   reported in association with these products.  By that time, Defendants knew of serious diseases

26   caused by unidentified agents transmissible by blood and Factor VIII and IX.  Defendants failed

27   to warn Plaintiff or the medical community of these adverse effects, violating industry standards

28   and federal regulations.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1        21.    By 1976, only a few years after Defendants' factor concentrate products

2    went on the market, the United States Food and Drug Administration ("FDA") Bureau of

3    Biologics held a conference titled *Unsolved Therapeutic Problems in Hemophilia.* The research

4    articles compiled from the conference discussed the high incidence of disorders in patients using

5    Defendants' products, such as liver dysfunction, enlarged spleen, Hepatitis B, and Non-A, Non-B

6    Hepatitis ("NANB Hepatitis," later renamed Hepatitis C). The articles concluded that these

7    disorders were tied to the patients' use of factor concentrates, and emphasized the risks entailed in

8    producing such concentrates using plasma from paid donors. For instance, Robert Gerety of the

9    FDA Bureau of Biologics, Division of Blood and Blood Products, reported that the agent or

10    agents of NANB Hepatitis "appear to be blood borne, perhaps to be associated with a form of

11    chronic hepatitis, and to represent a considerable risk to recipients who repeatedly require the

12    administration of blood products." Gerety, et al., *Viral Antigens and Antibodies in People with*

13    *Hemophilia* (1977). Gerety noted that "[t]he use of large plasma pools from paid donors no

14    doubt contributes to the risk of HBV [Hepatitis B] infection from these products," and stated that

15    "an all voluntary blood donor system is being pursued as a result of the known increased risk of

16    PTH [post-transfusion hepatitis] from blood derived from commercial donors." As described

17    below, however, Defendants not only refused to implement such a voluntary donor system, but

18    instead recruited paid donors precisely because their hepatitis exposure resulted in plasma from

19    which Defendants could make other commercially valuable products as well.

20        22.    At all times material to this Complaint, Defendants failed to adequately

21    warn Plaintiff or his physicians of the serious adverse side effects of their products. Although

22    Defendants' package inserts mentioned a risk that plasma "may" contain the causative agent of

23    viral hepatitis, this warning was seriously deficient in that: (a) Defendants failed to disclose that

24    the risk of hepatitis was essentially a 100% guarantee due to their practices of using high-risk

25    donors and specifically recruiting for donors who had previously been exposed to Hepatitis B; (b)

26    while "hepatitis" simply means inflammation of the liver, and may be a relatively benign,

27    temporary condition, Defendants failed to warn that some forms of hepatitis transmitted by their

28    products were believed to present a considerable risk of severe liver damage and a significantly

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    elevated risk of liver cancer; (c) Defendants misleadingly stated that the source plasma used in

2    preparation of their products had been found to be non-reactive for Hepatitis B surface antigen

3    (HBsAg)—implying that no viral hepatitis was present in the plasma—and falsely stated that

4    available methods were not sensitive enough to detect all units of potentially infectious plasma,

5    failing to disclose that in fact Defendants had refused to implement the more sophisticated

6    Hepatitis B Core antibody (HBc) test which would have excluded the majority of plasma

7    contaminated by hepatitis; and (d) Defendants' labeling disclosed that their products were made

8    from large pools of fresh human plasma, but failed to disclose that paid donors increased the risk

9    of disease, and that the particular groups of paid donors targeted by Defendants were known to be

10   the highest risk groups.

11          23.     The demand for and supply of anti-hemophilic factor rapidly increased

12   during the 1970s, with commercially-manufactured concentrate accounting for a large proportion

13   of the increase in supply.  In 1977, a federal report projected that the volume of factor

14   concentrates manufactured would increase substantially by 1980.  Division of Blood Diseases and

15   Resources, National Heart, Lung and Blood Institute, *Study to Evaluate the Supply-Demand*

16   *Relationships for AHF and PTC Through 1980*, at page 8; hereinafter "NHLBI Report."

17          24.     In order to sell more factor concentrates to this growing market,

18   Defendants turned to the fastest and cheapest way of obtaining sufficient plasma, paid donors.

19   Defendants recruited paid donors from those populations most likely to respond to the financial

20   incentive to donate:  poor inner city residents, drug abusers, prisoners, and residents of

21   impoverished developing countries such as Haiti and Nicaragua.

22          25.     Defendants purposefully sought out paid donors despite knowing that the

23   risk of diseases transmissible by blood was far greater among paid donors than among volunteers.

24   Because no test was yet available in the 1970s for the NANB Hepatitis virus, an essential means

25   to prevent the virus from contaminating the plasma supply was to exclude donors with behaviors

26   that were inconsistent with good health—precisely those populations from which Defendants

27   were recruiting paid donors.  Some studies indicated that paid donors were up to ten times more

28   infectious than volunteer donors.  For this reason, the National Blood Policy, adopted by the

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   federal government in July 1973, advocated conversion to an all-volunteer blood supply.

2   Defendants, however, not only continued to use paid donors, but also focused their recruiting

3   efforts on the highest risk populations.

4          26.    Defendants had an additional financial incentive for recruiting paid donors.

5   Factor VIII and Factor IX are only two of many products that can be made for commercial sale

6   from human plasma.  According to the NHLBI Report, by the late 1970s at least 17 different

7   therapeutic components of blood were manufactured by the process of "fractionating" plasma into

8   its various elements.  The NHLBI Report noted that, "as the costs of fractionation have increased,

9   fractionators have produced as many products as possible from a liter of plasma." *Id.* at 65.

10          27.    Blood derivatives used as vaccines or therapeutics had particularly high

11   economic value for Defendants.  The NHLBI Report noted that plasma with a very high titer, or

12   antibody level, for a corresponding antigen is "very expensive." *Id.* at 41.  Such products are

13   manufactured from source plasma drawn from donors who have been sensitized to a particular

14   antigen.  *Id.*  The NHLBI Report specifically stated, however, that "plasma collected for high

15   antibody titer **cannot** be used for fractionation into therapeutic products," such as Defendants'

16   factor concentrate.  *Id.* (emphasis added).

17          28.    Defendants targeted donors with high titers to Hepatitis B antigens in order

18   to manufacture and sell Hepatitis B immunoglobulin (HBIG), a product that confers temporary

19   immunity to the Hepatitis B virus.  Despite the warning in the NHLBI report, Defendants used the

20   same high-titer plasma obtained for making HBIG to manufacture their Factor VIII and IX

21   products used by people with hemophilia.  Defendants thus sought to maximize profits by

22   producing "as many products as possible from a liter of plasma," while ignoring industry

23   standards that precluded the use of high-titer plasma for other therapeutic products.

24          29.    Beginning in about 1978, Defendants began targeting homosexual donors

25   in known urban gay communities.  Because urban homosexuals had been reported in the 1970s to

26   have exceptionally high prevalence of Hepatitis B infection, Defendants knew that such donors

27   would provide a reliable source of plasma for the manufacture of commercially valuable HBIG.

28

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1           30.    By the 1970s, it was also well-known in the public health community that

2    urban homosexuals engaged in promiscuous sexual practices that rapidly transmitted other

3    diseases, including NANB Hepatitis, which were transmitted by blood and were believed to have

4    serious adverse consequences.  Despite this knowledge, Defendants used the same plasma pool

5    from urban homosexuals to manufacture both HBIG and Factor VIII and IX.

6           31.    By the 1970s, it was also well-established that plasma from prison

7    populations carried a high risk of hepatitis and other blood-borne diseases, primarily because of

8    the concentration of intravenous (IV) drug users in prisons.  By 1974, the alanine

9    aminotransferase ("ALT") test was available to test for elevated levels of liver enzymes called

10    SGOT that indicate the presence of hepatitis.  Prisoners were associated with SGOT levels of

11    over 60 IUs per ml, a level that increases the risk of Hepatitis C transmission by a factor of 6.

12    Despite knowledge of this risk, Defendants actively recruited prisoners for plasma used to

13    manufacture Factor VIII and IX, while concealing or failing to disclose the risk to Plaintiff, his

14    physicians, or the FDA.

15           32.    In light of Defendants' special knowledge of the disease patterns among

16    urban homosexuals and prisoners, and their recruitment of such donors for Factor VIII and IX

17    manufacture, Defendants had duties to: (a) discontinue the practice of using such high risk

18    donors; (b) disclose the risk to Plaintiff, his physicians, and the FDA, including the ongoing risk

19    of continuing to use Factor VIII and IX previously manufactured with high risk plasma and still

20    marketed to patients; (c) implement procedures to kill blood-borne diseases in the products; and

21    (d) recall existing products from distribution or further use.  Instead, Defendants continued to

22    conceal their recruitment of high-risk donors and to resist warnings and recalls, and failed to

23    implement procedures to make their products safe.

24           33.    By no later than 1978, Defendants knew of the availability of a new test to

25    determine whether an individual had a history of viral hepatitis, which would have disqualified

26    the donor from providing plasma for the manufacture of Factor VIII or IX.  By testing a person's

27    serum for the presence of the core to the Hepatitis B antibody, a history of viral hepatitis could be

28    verified.  This was known as the "HBc test."  Published, peer-reviewed literature shows that the

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    HBc test was in use by researchers to determine that homosexual AIDS victims had a history of

2    viral hepatitis by no later than December 1981. Gottlieb, et al., *Pneumocystis Carinii Pneumonia*

3    *and Mucosal Candidiasis in Previously Healthy Homosexual Men,* 305 New Eng. J. Med. 1425-

4    1431 (1981).

5              34.    Use of the HBc test would have eliminated approximately 75% of

6    homosexual plasma donors and over 90% of promiscuous urban homosexuals. It would have

7    eliminated almost 100% of intravenous drug users.

8              35.    Use of the HBc and ALT tests together by Defendants by 1981 would have

9    eliminated the vast majority of the transmitters of HCV from the blood and plasma pools of the

10   nation, before the height of the Hepatitis C epidemic. If Defendants had implemented this test in

11   a timely manner, Plaintiff more likely than not would not have been infected with HCV as a result

12   of factor concentrate use.

13             36.    As noted below, federal regulations required plasma donors to be in good

14   health, and donors with a "history of viral hepatitis" were by definition unacceptable as blood or

15   blood plasma donors. Persons with a history of viral hepatitis were excluded not only because of

16   the risk of transmitting Hepatitis B, but because such a history indicated a lifestyle or previous

17   behavior of the prospective donor that carried the risk of transmitting other viruses in addition to

18   hepatitis. A reasonable and prudent plasma fractionator would not accept a HBc positive donor

19   and expect to be in compliance with federal regulations as of 1978.

20             37.    After public reports of the first hemophilia AIDS cases in July 1982,

21   government officials urged Defendants to implement the HBc test as a "surrogate" or "marker" to

22   eliminate plasma contaminated by the transmitter of AIDS and Hepatitis C. HBc testing was also

23   strongly suggested to Defendants by the CDC at a meeting of the United States Public Health

24   Service ("PHS") on January 4, 1983. Despite this urging, Defendants continued to use

25   contaminated plasma donations that would have been excluded by the HBc test and continued to

26   conceal from Plaintiff, his physicians, and the FDA the dangerous practice of targeting donors at

27   highest risk for hepatitis. At a January 6, 1983 meeting of Defendants' trade association, the

28   Pharmaceutical Manufacturer's Association, Defendants agreed <u>not</u> to implement the highly

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

effective HBc donor screening, and instead opted to use ineffective donor questionnaires that did

little to screen out donors at high-risk for Hepatitis C transmission.

38.    As late as December 13, 1983, years after the HBc test was available, a

memorandum from CUTTER's responsible head, Stephen Ojala, reporting back on a meeting

held by Defendants, shows that Defendants conspired to propose a "task force" to further study

the use of HBc as an intentional, bad faith "delaying tactic for the implementation" of the test.

**C.**    **Defendants Also Declined to Implement Available Treatment With Solvents and/or Detergents to Kill Blood-Borne Diseases, and Continued to Dump Contaminated Product on the Market After Safer Product Was Available**

39.    In the late 1970s and early 1980s, it was recognized that viruses were in all

factor concentrate products.  Treatment with solvents and/or detergents was available at that time

to eliminate many of these viruses, including HCV.  Defendants were required to take reasonable

steps to eliminate contamination, but Defendants failed to utilize these available technologies to

eliminate the viruses in a timely manner.

40.    Solvent and/or detergent treatment was available to Defendants by the late

1970s as a simple and effective method of eliminating viruses in factor concentrate products.

Solvents and/or detergents effectively kill viruses such as HCV by destroying the viruses' lipid

envelope.  This method is simpler than heat treatment, and unlike heat treatment does not

interfere with the Factor VIII and IX proteins needed for blood clotting.

41.    Solvents and/or detergents were well-known, commercially available

products as of the 1970s, and studies in which solvent and/or detergent treatment was used to

disrupt viruses were published in the 1970s in peer-reviewed journals.  In 1980, Dr. Edward

Shanbrom, a former Baxter scientist, received a patent for a detergent treatment process for viral

inactivation of factor concentrate.  Dr. Shanbrom describes the implementation of this process as

"as easy as washing your hands."

42.    After receiving the patent, Dr. Shanbrom approached Defendants about

implementing his method, but Defendants refused to heed Dr. Shanbrom's advice.  Defendants

refused to even commit any resources to investigate the solvent and/or detergent method.

43.      Defendants were notified of the successful use of organic solvents to destroy lipid viruses, including NANB, in factor concentrates by the New York Blood Center ("NYBC") at the National Hemophilia Federation's meeting on October 27, 1983.

44.      In 1984, Dr. Prince and Dr. Horowitz of the NYBC published the results of their successful use of the solvent detergent process in well-known medical journals. They offered to license the process to Defendants for a reasonable fee. In 1985, the NYBC obtained a license from the FDA to market a solvent detergent inactivated factor concentrate.

45.      By March, 1984, Defendants obtained licenses to sell Factor VIII treated with dry heat to inactivate viruses, and Defendants had obtained such licenses for Factor IX by October, 1984. The FDA did not allow them to label these products as hepatitis safe. By fall of 1984, Defendants were notified by treaters that previously-untreated patients in their clinical trials using their dry heated products developed elevated ALT enzymes, indicative of NANB infections.

46.      Defendants were therefore aware in 1984 that dry heat did not effectively inactivate the virus that causes HCV, and that solvent detergent treatment methods did eliminate the risk of HCV infection, but chose not to employ the effective and efficient solvent detergent technology. Instead, Defendants continued to sell their contaminated dry heat product for at least four more years, resulting in the needless infection of Plaintiff and many other hemophiliacs.

47.      A recent CDC study documented the comparative effectiveness of the dry heat and solvent detergent inactivation methods. The study reported that "84% of previously untreated patients infused with dry-heated Factor VIII products developed non-A, non B hepatitis… ." Soucie, Richardson, Evatt et al., *Risk Factor for Infection with HBV and HCV in a Large Cohort of Hemophiliac Males*, 41 Transfusion 338-343 (2001).

48.      The same CDC study reported that "solvent detergent treatment of blood components [was] found to be more effective against enveloped viruses than heat treatment … No cases of HBV, HCV, or HIV transmission through solvent detergent virus inactivated products have been found in prospective studies of previously untreated patients..."

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

49.    The study further reported "in our data, the first dramatic decline in HCV prevalence appears in the 1987 birth cohort. The drop in HCV transmission correlates with the licensing of solvent detergent treatment of Factor IX products in 1987. In addition, this cohort would have been the first to benefit from the screening of blood donors using the surrogate markers ALT (begun in late 1986) and anti-HBc (begun in 1987), testing that was associated with a markedly decreased risk of HCV infection from blood transfusions."

50.    The study states further that "the residual transmissions after 1987 possibly represent the use of product already manufactured or product manufactured during the interval required to implement the new technology. The 18-month shelf life of factor concentrates placed those people with hemophilia born as late as 1989 at risk of infection." The study goes on to recommend testing for all people with hemophilia who received infusions of Defendants' blood products prior to 1992.

51.    By 1988, it was clear to the medical and scientific community what Defendants had long known: dry-heated factor concentrates were transmitting the potentially deadly NANB virus, and safer products were available. This knowledge prompted the CDC to publish recommendations that dry-heated products no longer be used by hemophiliacs. Defendants continued sales of their dry-heated products after these warnings, however, and never undertook a large-scale recall of dry-heated product. Defendants finally introduced solvent detergent-treated products to the market in 1988 and 1989, but continued to sell their NANB-contaminated dry-heated factor concentrates after this date.

52.    The failure of Defendants to implement solvent and/or detergent viral inactivation techniques in a timely manner, to warn of the risk that dry heat treated Factor VIII and IX blood products could transmit HCV, and to recall dry heat-treated products that posed this risk caused the needless infection of thousands of people with hemophilia with HCV, including Plaintiff. Even after Defendants knew or should have known that solvent and/or detergents effectively destroyed HCV, they continued to sell dry heat-treated Factor VIII and IX, and refused to recall these dangerous products from the market.

**D.    Defendants Fraudulently Misrepresented the Safety, and Concealed the Dangers, of Their Factor VIII and IX Products**

53.    Defendants engaged in a pattern and practice of fraudulent concealment of their dangerous practices, fraudulent misrepresentations regarding their efforts to assure safety, and fraudulent misrepresentations regarding the risk of Hepatitis C, in order to maintain profits from both factor concentrates and HBIG.  A summary of Defendants' fraudulent misrepresentations and concealment is set forth below.

54.    On July 27, 1982, a meeting of the Public Health Service was held as the result of the CDC's report that three people with hemophilia had contracted AIDS.  The responsible heads of Defendants were in attendance, along with officials from the National Hemophilia Foundation, CDC and FDA.  Defendants were aware that they had used plasma from known, targeted homosexuals in the manufacture of their Factor VIII and IX blood products. These products had a shelf life of two years and were either in production or already on the shelves in pharmacies waiting to be infused by people with hemophilia who purchased them. Defendants failed to disclose these facts at the meeting where CDC officials were present, despite knowledge that the CDC's primary concern at that meeting was the contamination of Factor VIII and IX by the agent that transmitted AIDS, which, like hepatitis, was already well-known to be epidemic in the targeted homosexual population.  (CUTTER memorandum dated August 3, 1982.)

55.    In or about December, 1982, Rodell, the responsible head for BAXTER, entered into an agreement with officials of the FDA to the effect that BAXTER would no longer use prison plasma in the production of factor concentrates.  In fact, BAXTER, unbeknownst to the FDA, continued to use prison plasma in factor concentrate production through October 1983. BAXTER memorandum dated October 20, 1983.

56.    On January 5, 1983, an AIDS meeting was held at Children's Orthopedic Hospital in Los Angeles, California, the largest hemophilia treatment center in the United States. Representatives of Defendants were present at the meeting with treaters and patients.  A patient asked representatives from Defendants the following question: "Is the plasma from homosexuals,

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   prisoners, Haitians or other high risk persons being used in the manufacture of concentrates?"

2   Defendants did not admit targeting or using plasma from homosexuals, prisoners or inner city IV

3   drug abusers. Defendants' representatives made no response to the question, thereby concealing

4   the true risk created by the use of plasma from known homosexuals, IV drug abusers and

5   prisoners in the manufacture of factor concentrates.

6          57.    At the January 5, 1983 meeting, and in the presence of the patients, one of

7   the treating physicians, Dr. Kasper, asked CUTTER's Stephen Ojala: "These [plasma] centers

8   seem to be in rundown centers of town. Is there a move to move them to rural towns?" Ojala

9   answered: "Many of the centers are in smaller communities and in towns such as Ypsilanti,

10  Seattle, Clayton, NC., and San Diego. We do not have centers in L.A. or San Francisco." This

11  answer was misleading because Ojala failed to state that CUTTER's largest and first plasma

12  center was located at Arizona State Penitentiary. CUTTER also had a center at the Las Vegas

13  Prison. Ojala and CUTTER were well aware of the CDC's and FDA's concern over use of prison

14  plasma, due to homosexual practices and drug abuse in the prison donor population. Many of

15  CUTTER'S centers were in inner city areas frequented by IV drug abusers, such as downtown

16  Oakland, California. CUTTER had also used plasma from centers which targeted known

17  homosexuals. In August 1982, CUTTER quarantined plasma from the Valley Medical Center, a

18  center which targeted known homosexuals, because a donor was hospitalized with full blown

19  AIDS. The plasma was intended for factor concentrate and HBIG production, but was not used

20  because it had thawed on the way to the processing plant. Upon receiving a report of this incident

21  from CUTTER, the FDA indicated a recall might have been necessary if the plasma had been

22  incorporated into factor concentrate final product. Ojala omitted any mention of these facts and

23  circumstances in his response to Dr. Kasper regarding the location of their plasma centers.

24  (CUTTER memorandum dated January 5,1983.)

25          58.    On January 14, 1983, responsible heads from Defendants attended a

26  meeting of the National Hemophilia Foundation ("NHF"). Defendants were very concerned that

27  the NHF would insist on a recommendation that HBc testing be implemented, consistent with the

28  CDC recommendation 10 days earlier. In order to defer a NHF recommendation that HBc testing

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    be used, Michael Rodell, a representative of BAXTER, told NHF officials on behalf of

2    Defendants, that surrogate testing was in the "R and D," or "Research and Development," stage

3    currently.  Rodell concealed the fact that the CDC had strongly recommended use of the HBc

4    antibody test as a screening device for high risk donors.  The HBc antibody test was not in the "R

5    and D" stage, and was suitable for use as a screening device for high risk AIDS and Hepatitis C

6    donors.  In fact, the HBc test had been approved in 1979 by the FDA as a test to be used to

7    ascertain a history of previous hepatitis B infection, and to screen blood and plasma donors.

8    Donors with a hepatitis history were specifically prohibited pursuant to the federal regulations (21

9    C.F.R. § 640.63).  Rodell acknowledged that implementation of the HBc test would eliminate

10   high titered immunoglobulin donors, but failed to disclose that opposition to use of the test was

11   based on economic rather than safety concerns.

12          59.     At the January 14, 1983 meeting, Defendants concealed their advertising in

13   publications distributed among urban homosexuals, for the specific purpose of attracting them to

14   plasma centers which supplied high titered plasma to Defendants.  Defendants also concealed

15   their extensive use of prison plasma, and failed to reveal their "gentlemen's agreement" with the

16   FDA to discontinue use of these plasma sources immediately.  (CUTTER Memorandum dated

17   January  17, 1983.)

18          60.     On or about December 15, 1983, Rodell, then the head of Armour

19   Pharmaceutical Company, Inc., told members of the federal Blood Product Advisory Committee

20   (BPAC) and FDA officials that Defendants wanted a three-month deferral in implementation of

21   any recommendations by the BPAC or FDA that HBc testing be required for plasma donors.

22   Rodell told the FDA that the purpose of the deferral was to prepare a response to the proposed

23   recommendation.  In fact, Defendants had agreed to seek the three-month hiatus as a "delaying

24   tactic" to avoid implementing the test, and the request for a deferral was made in bad faith.

25   (CUTTER memorandum dated December 13, 1983.)

26          61.     Defendants fraudulently misrepresented the risk of Hepatitis C due to

27   factor concentrates, failed to disclose accurate warnings of the risk to Plaintiff or his physicians,

28   and fraudulently purported to be doing "everything possible" to improve safety, when in fact

- 17 -
615781.1

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   Defendants maximized the risk by recruiting high-risk donors and by resisting and obstructing

2   HBc testing, treatment with solvents and/or detergents, and other measures that would truly have

3   reduced the risk.

4   E.    **Defendants' Activities Were Subject to Applicable Federal Regulations,**
        **Which Evidence the Standard of Care With Which Defendants Should Have**
5        **Complied**

6          62.    Blood derivatives such as Factor VIII and IX are prescription biologicals

7   subject to federal regulation as both "biological products" and "drugs." Public Health Service

8   Act, "Regulation of Biological Products," 42 U.S.C. § 262; Food, Drug & Cosmetic Act

9   ("FDCA"), 21 U.S.C. § 301, *et seq. (2005)*.

10         (a)    21 U.S.C. § 331(b) prohibited and continues to prohibit

11  "adulteration or misbranding of any … drug . . . ."

12         (b)    21 U.S.C. § 351(a)(2)(B) provided and continues to provide that

13  "[a] drug . . . shall be deemed to be adulterated . . . if . . . the methods used in, or the facilities or

14  controls used for, its manufacture, processing, packing, or holding do not conform to or are not

15  operated or administered in conformity with current good manufacturing practice to assure that

16  such drug meets the requirements of this chapter as to safety. . . ."

17         (c)    21 U.S.C. § 352 provided and continues to provide that "[a] drug…

18  shall be deemed to be misbranded. .. if its labeling is false or misleading in any particular."

19         (d)    21 U.S.C. § 352(f)(2) provided and continues to provide that a drug

20  shall be deemed to be "misbranded" unless its labeling bears "adequate warnings against use. ..

21  where its use may be dangerous to health."

22         (e)    21 U.S.C. § 352(n) provided and continues to provide that a drug

23  shall be deemed to be "misbranded" unless the labeling included information concerning side

24  effects and contraindications as required in federal regulations.

25         (f)    21 U.S.C. § 321(n) provided and continues to provide that if an

26  article is alleged to be misbranded because the labeling or advertising is misleading, then the

27  determination of whether the labeling or advertising is misleading shall take into account "not

28  only representations made or suggested" by affirmative statements, "but also the extent to which

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

the labeling or advertising fails to reveal facts material in the light of such representations or

material with respect to consequences which may result from the use" of the drug.

63.    At all times material to this Complaint, 21 C.F.R. § 201.57(e) provided and

continues to provide as follows, with respect to information to be provided with the sale of

Defendants' products:

> Warnings: Under this section heading, the labeling shall describe
> serious adverse reactions and potential safety hazards, limitations in
> use imposed by them, and steps that should be taken if they occur.
> The labeling shall be revised to include a warning as soon as there
> is reasonable evidence of an association with a drug; a causal
> relationship need not have been proved.

64.    At all times material to this Complaint, 21 C.F.R. § 200.5 provided and

continues to provide as follows:

> Manufacturers and distributors of drugs and the Food and Drug
> Administration occasionally are required to mail important
> information about drugs to physicians and others responsible for
> patient care.  In the public interest, such mail shall be distinctive in
> appearance so that it will be promptly recognized and read.

65.    At all times material to this Complaint, Part 606 of 21 C.F.R. set forth and

continues to set forth "Current Good Manufacturing Practices" for biological products generally,

and 21 C.F.R. § 640, *et seq.*, set forth additional good manufacturing practices for blood and

plasma biologicals.

66.    At all times material to this Complaint, 21 C.F.R. § 606.140(a) provided

and continues to provide:

> Laboratory control procedures shall include: The establishment of
> scientifically sound and appropriate specifications, standards and
> test procedures to assure that blood and blood components are safe,
> pure, potent and effective.

67.    At all times material to this Complaint, 21 C.F.R. § 640.60 defined and

continues to define "Source Plasma" as:

> the fluid portion of human blood collected by plasmapheresis, and
> is intended as source material for further manufacturing use.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    68.    At all times material to this Complaint, 21 C.F.R. § 640.63(c), (1999),

2 titled "Qualification of Donor," provided and continues to provide as follows with respect to

3 donors of source plasma:

> Donors shall be in good health on the day of donation, as indicated
> in part by: . . . (9) freedom from any disease, other than malaria,
> transmissible by blood transfusion, in so far as can be determined
> by history and examination indicated in this section; (10) freedom
> of the arms and forearms from skin punctures or scars indicative of
> addiction to self-injected narcotics; (11) freedom from a history of
> viral hepatitis; (12) freedom from a history of close contact within
> six months of donation with an individual having viral
> hepatitis; . . . .

9 Further, 21 C.F.R. § 640.63(a) provided and continues to provide that the method of determining

10 "suitability of a donor" included "tests" as well as the taking of a history and physical

11 examination.

12    69.    The foregoing statutes and regulations are evidence of the standard of care

13 Defendants should have employed in the manufacture and sale of Factor VIII and Factor IX.

14 Defendants violated the foregoing regulations and/or failed to comply with applicable standards

15 of care by:  (a) marketing "adulterated" products that were unsafe as a result of failure to comply

16 with "Current Good Manufacturing Practice"; (b) marketing "misbranded" products that were

17 misleading and failed to disclose or warn of health dangers; (c) failing to warn of serious adverse

18 reactions and potential safety hazards as soon as there was reasonable evidence of an association

19 with their products; (d) failing to exclude intravenous drug users who were unsuitable donors;

20 (e) failing to exclude donors with a history of viral hepatitis who were unsuitable donors;

21 (f) affirmatively seeking out unsuitable donors known to have viral hepatitis antibodies, as well as

22 prison populations known to include substantial numbers of intravenous drug users, for inclusion

23 of their plasma in the pools used to make Factor VIII and Factor IX; (g) failing to disclose their

24 use of dangerous donors; and (h) failing to use appropriate tests and/or procedures to assure their

25 products were safe.

26    **F.    Conspiracy, Concert of Action and Group Liability**

27    70.    Defendants acted in concert and participated in a conscious and deliberate

28 conspiracy to act negligently, fraudulently and with willful and wanton disregard for the rights

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   and safety of blood product users, in connection with the manufacture of Factor VIII and IX

2   blood products and the collection of constituent plasma.

3            71.    Defendants herein tacitly and explicitly agreed to avoid upgrading industry

4   standards.  For example, the technology to virally inactivate factor concentrates existed in the

5   early 1970s, but was not seriously investigated by any Defendant until the 1980s, despite its

6   effective use in Europe.  Likewise, use of the HBc antibody test to eliminate Hepatitis B carrier

7   donors, and to identify donors with a history of viral hepatitis, was known science by 1978.  The

8   HBc test was reported to be an effective surrogate test for both AIDS and NANB Hepatitis

9   carriers by 1982, yet no Defendants implemented this test until April 1984.

10           72.    Several of the Defendants intentionally used donors from predominantly

11  homosexual donor centers, prisons, and inner city areas where the risk of IV drug abuse was high.

12  After July 1982, when the results of this conduct culminated in reports of fatal immune

13  suppression in three people with hemophilia who infused the product, this concert of action took

14  on a more overt, active form.

15           73.    By December 1982, the FDA demanded that Defendants stop using

16  prisoners, donors from high-risk areas for hepatitis and AIDS transmission, and known

17  homosexuals.  Rather than use good faith efforts to comply with the FDA's requests, Defendants

18  collectively argued for a far less onerous and less effective donor screening program.  At a

19  January 6, 1983 meeting of Defendants' trade association, the Biological Section of the

20  Pharmaceutical Manufacturer's Association ("PMA"), Defendants agreed not to implement

21  highly effective HBc donor screening, instead selecting ineffective donor questionnaires that did

22  little to screen out donors at high risk for NANB transmission.  Defendants further agreed to keep

23  each other informed as to what they were doing in order to maintain a low standard of care.

24           74.    HBc testing had been strongly suggested by the CDC at the January 4,

25  1983 Public Health Service ("PHS") meeting.  On January 14, 1983,  Defendants acted jointly to

26  persuade the National Hemophilia Foundation ("NHF") not to advocate surrogate testing for

27  AIDS and Hepatitis C through implementation of the HBc test.   Defendants persuaded the NHF

28  that use of the HBc test was in the "R and D" stage and not practical to implement at that time.

- 21 -
615781.1

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    On December 13, 1983, Stephen Ojala, CUTTER's responsible head, documented by written

2    memorandum that Defendants met and jointly agreed to propose a "study" of the HBc surrogate

3    screening test, as a "delaying tactic" to avoid implementing the HBc test.

4         75.    Thereafter, at various times throughout 1983-1985, Defendants attended

5    meetings or otherwise communicated to assure joint efforts to avoid recalling product; to avoid

6    warning patients of the true risk; to market product when sales dropped due to information in the

7    lay press related to viral transmission through factor concentrates; to avoid implementation of the

8    HBc test; and to coordinate a joint legal defense plan in anticipation of litigation from patients

9    infected by AIDS and NANB through use of the products.  Defendants also operated through

10   trade organizations, such as ABRA and PMA, to issue public statements minimizing the risk of

11   Hepatitis C and overpromoting the benefits of factor concentrate, and to carry out the

12   abovementioned goals of all Defendants.

13        76.    All Defendants likely to have caused the harm to Plaintiffs are parties to

14   this lawsuit and properly before the court.

15        77.    The conduct of Defendants, with respect to their Factor VIII and Factor IX

16   products and related plasma collection methods, was tortious.

17        78.    The harm which has been caused to Plaintiffs resulted from the conduct of

18   one, or various combinations of the Defendants, and, through no fault of Plaintiffs, there may be

19   uncertainty as to which one or combination of Defendants caused the harm.

20        79.    The burden of proof should be upon each Defendant to prove that the

21   Defendant has not caused the harms suffered by Plaintiffs.

22        80.    Factor concentrates were manufactured using the same fractionation

23   method by all Defendants.  As such, during the relevant years, factor concentrates were a fungible

24   product, and physicians prescribed the products interchangeably without regards to brand names.

25        81.    The factor concentrates manufactured by Defendants contained the same

26   design flaws.  They were all manufactured from paid donor plasma, which was at highest risk for

27   Hepatitis B and Hepatitis C viral transmission.  In addition, all Defendants' factor concentrates

28   were made from large pools consisting of 5,000 to over 20,000 paid donors, which further

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    magnified the risk of viral transmission.

2        82.    None of the factor concentrates made by Defendants during the relevant

3    time period were subjected to viral inactivation processes such as solvent and/or detergent

4    treatment that were effective against HCV. Therefore, all of Defendants' factor concentrates

5    carried a significant risk of HCV transmission during this time. In addition, all of Defendants'

6    factor concentrate products were similarly misbranded. All of the products failed to warn of the

7    known risks enumerated in this complaint.

8    V.    **TOLLING OF APPLICABLE STATUTES OF LIMITATION**

9        83.    Any and all potentially applicable statutes of limitations have been tolled

10   by Defendants' affirmative and intentional acts of fraudulent conduct, concealment, and

11   misrepresentation, alleged above, which estop Defendants from asserting statutes of limitation.

12   Such acts include but are not limited to intentionally covering up and refusing to disclose use of

13   high-risk plasma; selling products known to be contaminated; suppressing and subverting medical

14   and scientific research; and failing to disclose and suppressing information concerning the risk of

15   HCV transmission from Defendants' contaminated factor concentrates.

16       84.    Defendants are estopped from relying on any statutes of limitation because

17   of their fraudulent concealment and misrepresentation alleged above. Defendants were under a

18   duty to disclose the precise risks of HCV transmission from their contaminated factor concentrate

19   because this is nonpublic information over which they had exclusive control, because Defendants

20   knew this information was not readily available to people with hemophilia like Plaintiff, and

21   because this information was relevant to such people in deciding whether to use Defendants'

22   factor concentrate.

23       85.    Until very recently, Plaintiff had no knowledge that Defendants were

24   engaged in much of the wrongdoing alleged herein. Because of the fraudulent and active

25   concealment of the wrongdoing by Defendants, including but not limited to deliberate efforts—

26   which continue to this day—to give Plaintiff the materially false impression that Defendants

27   undertook all feasible safety precautions to reduce the risk of HCV transmission from their

28   contaminated factor concentrates, Plaintiff could not reasonably have discovered the wrongdoing

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    any time prior to this time, nor could Plaintiff have, as a practical matter, taken legally effective

2    action given the unavailability, until very recently, of internal memoranda and other documents

3    (as generally described herein) as evidence in support of Plaintiff's claims.  Defendants still

4    refuse to admit and continue to conceal their wrongdoing, and therefore Defendants' acts of

5    fraudulent concealment and misrepresentation continue through the present time.

6    **VI.    CLAIMS FOR RELIEF**

7    **FIRST CLAIM FOR RELIEF**

8    **FRAUDULENT OMISSION AND CONCEALMENT**

9            86.    Plaintiff incorporates by reference all previous paragraphs of this

10   Complaint as if fully set forth here and further alleges as follows:

11           87.    Defendants had a confidential and special relationship with Plaintiff due to:

12   (a) Defendants' vastly superior knowledge of the health and safety risks relating to Factor VIII

13   and Factor IX; (b)  Defendants' sole and/or superior knowledge of their dangerous and

14   irresponsible plasma collection practices; and (c) Defendants' direct communications with the

15   hemophiliac community through newsletters that purported to accurately convey the risk of

16   NANB.  As a result, Defendants had an affirmative duty to fully and adequately warn the

17   hemophiliac community, including Plaintiff and physicians, of the true health and safety risks

18   related to their Factor VIII and Factor IX blood products and constituent plasma, and a duty to

19   disclose their dangerous and irresponsible plasma collection practices.  Independent of any

20   special relationship of confidence or trust, Defendants had a duty not to conceal the dangers of

21   their products to Plaintiff and his physicians.

22           88.    Misrepresentations made by Defendants about the health and safety of their

23   factor concentrate products independently imposed a duty upon Defendants to fully and

24   accurately disclose to the hemophiliac community, including Plaintiff and physicians, the true

25   health and safety risks related to Factor VIII and Factor IX and its constituent plasma, and a duty

26   to disclose their dangerous and irresponsible plasma collection practices.

27           89.    In connection with their Factor VIII and Factor IX products, Defendants

28   fraudulently and intentionally concealed important and material health and safety product risk

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    information from Plaintiff, the hemophiliac community, and treating physicians, all as alleged in

2    this Complaint.

3           90.     Any of the following is sufficient to independently establish Defendants'

4    liability for fraudulent omission and/or concealment:

5          a.     Defendants fraudulently concealed the health and safety hazards, symptoms, diseases and/or health problems associated with their Factor VIII and Factor IX blood products and related plasma collection activities;

6

7

8          b.     Defendants fraudulently concealed the practice of using unsuitable plasma from unsuitable donors in the manufacture of their Factor VIII and Factor IX blood products;

9

10          c.     Defendants fraudulently concealed their practice of avoiding the use of available technology to detect viruses in their Factor VIII and Factor IX blood products and the components thereof;

11

12          d.     Defendants fraudulently concealed their practice of avoiding the use of available technology to destroy viruses in their Factor VIII and Factor IX blood products and the components thereof; and/or

13

14

15          e.     Defendants fraudulently concealed information about the known comparative risks and benefits of the use of their Factor VIII and Factor IX and the relative benefits and availability of alternate products and therapies.

16

17          91.     Defendants knew that Plaintiff, the hemophiliac community, and

18    physicians would regard the matters Defendants concealed to be important in determining a

19    course of treatment, including the decision whether to use their Factor VIII and/or Factor IX

20    blood products.

21          92.     As a direct and proximate result of Defendants' fraudulent concealment

22    and suppression of material health and safety risks relating to their Factor VIII and Factor IX

23    blood products and of Defendants' dangerous and irresponsible plasma collection practices,

24    Plaintiff has suffered and will continue to suffer injury, harm and economic loss.  As the direct,

25    proximate and legal result of the Defendants' fraudulent concealment and suppression of material

26    health and safety risks relating to their Factor VIII and Factor IX blood products and of

27    Defendants' dangerous and irresponsible plasma collection practices, Plaintiff has been injured

28    and has incurred damages, including but not limited to permanent physical injuries to his person,

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1  medical and hospital expenses in the past, past disability, past loss of use of the body, and past

2  physical and mental pain and suffering; and will incur in the future medical and hospital

3  expenses, permanent disability, loss of use of the body, physical and mental pain and suffering,

4  and loss of the enjoyment of life.

5          93.    Plaintiff is therefore entitled to damages in an amount to be proven at trial,

6  together with interest thereon and costs.

7          94.    Defendants' conduct, as alleged above, was malicious, intentional and

8  outrageous and constituted willful and wanton disregard for the rights or safety of others. Such

9  conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

10         95.    Plaintiff is informed and believes that Defendants utilize retention policies

11  that provide for scheduled destruction of documents and other items, which may result in the

12  knowing, negligent, or inadvertent destruction of documents, data, and materials relevant and

13  necessary to adjudication of this action, including, but not limited to, records identifying batch or

14  lot numbers of Defendants' products shipped to particular treatment facilities, which may

15  facilitate product tracing. This risk warrants an order from this Court that such evidence

16  (including all documents, data compilations, and tangible things within the meaning of Rule 26 of

17  the Federal Rules of Civil Procedure) be preserved and maintained for use in these proceedings.

18                              **SECOND CLAIM FOR RELIEF**

19                              **BREACH OF IMPLIED WARRANTY**

20         96.    Plaintiff incorporates by reference all previous paragraphs of this

21  Complaint as if fully set forth here and further alleges as follows:

22         97.    Defendants' factor concentrate products were intentionally designed,

23  manufactured, promoted, distributed and sold to be introduced into the human body.

24         98.    Defendants breached the implied warranties of merchantability and fitness

25  because Defendants' factor concentrate products cannot pass without objection in the trade, are

26  unsafe, are not merchantable, are unfit for their ordinary use when sold, and are not adequately

27  packaged and labeled.

28

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1      99.    Plaintiff is therefore entitled to damages in an amount to be proven at trial,

2    together with interest thereon and costs.

3                              **THIRD CLAIM FOR RELIEF**

4                                    **NEGLIGENCE**

5      100.    Plaintiff incorporates by reference all previous paragraphs of this

6    Complaint as if fully set forth here and further alleges as follows:

7      101.    Defendants marketed their Factor VIII and/or Factor IX blood products to

8    and for the benefit of Plaintiff, and knew or should have known that Plaintiff would use their

9    Factor VIII and/or Factor IX blood products.

10     102.    Defendants owed Plaintiff duties to exercise reasonable or ordinary care

11   under the circumstances in light of the generally recognized and prevailing best scientific

12   knowledge.

13     103.    Through the conduct described in the foregoing and subsequent paragraphs

14   of this Complaint, Defendants breached their duties to Plaintiff.  The following sub-paragraphs

15   summarize Defendants' breaches of duties to Plaintiff and describe categories of acts or

16   omissions constituting breaches of duties by Defendants. Each and/or any of these acts or

17   omissions establishes an independent basis for Defendants' liability in negligence:

18   a.    Failure to exercise reasonable care in producing Factor VIII and Factor IX
19         blood products that were free of viruses, including the virus that causes
            Hepatitis C;

20   b.    Failure to exercise reasonable care in assuring that only suitable plasma
21         would be used in manufacturing their Factor VIII and Factor IX blood
22         products;

23   c.    Failure to exercise reasonable care in testing plasma used in manufacturing
            their Factor VIII and Factor IX blood products for viral contamination;

24   d.    Failure to exercise reasonable care in recruiting and screening donors of
25         plasma used in their manufacture of Factor VIII and Factor IX blood
26         products;

27   e.    Failure to reasonably employ anti-viral techniques, including solvent
            and/or detergent treatment, in the manufacture of their Factor VIII and
28         Factor IX blood products;

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

f.  Unreasonable overpromotion of their Factor VIII and Factor IX blood products;

g.  Understating the relative value of hemophilia treatments that constituted alternatives to their Factor VIII and Factor IX blood products;

h.  Failure to warn physicians, Plaintiff, and the hemophilia community of the dangers associated with their Factor VIII and Factor IX blood products and/or the viruses and foreign bodies contained within the plasma used in manufacturing their Factor VIII and Factor IX blood products;

i.  Failure to exercise reasonable care by complying with federal regulations then applicable to plasma collection and the manufacture of Factor VIII and Factor IX blood products;

j.  Failure to exercise reasonable care in disseminating information about their methods of manufacturing their Factor VIII and Factor IX blood products and the risks that were created by said methods; and

k.  Failure to exercise reasonable care in recalling their Factor VIII and Factor IX blood products.

104.    Defendants knew, or should have known, that due to their failure to use reasonable care, Plaintiff and other people with hemophilia would use and did use Defendants' Factor VIII and/or Factor IX products to the detriment of their health, safety and well-being.

105.    As the direct, proximate and legal result of the Defendants' negligence, Plaintiff has been injured and has incurred damages, including but not limited to permanent physical injuries to his person, medical and hospital expenses in the past, past disability, past loss of use of the body, and past physical and mental pain and suffering; and will incur in the future medical and hospital expenses, permanent disability, loss of use of the body, physical and mental pain and suffering, and loss of the enjoyment of life.

106.    Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

107.    Defendants' conduct, as alleged above, was malicious, intentional and outrageous, and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1

### FOURTH CLAIM FOR RELIEF

2

### NEGLIGENCE PER SE

3      108.    Plaintiff incorporates by reference all previous paragraphs of this

4  Complaint as if fully set forth here and further alleges as follows:

5      109.    Defendants violated applicable federal statutes and regulations relating to

6  prescription drugs.  Plaintiff is a person whom these statutes and regulations were meant to

7  protect.

8      110.    Defendants' violation of these statutes or regulations constitutes negligence

9  per se.

10     111.    Defendants' violation of these statutes or regulations was the direct,

11 proximate and legal cause of Plaintiff's injuries and damages.  As the direct and legal result of the

12 Defendants' negligence, Plaintiff has been injured and has incurred damages, including but not

13 limited to permanent physical injuries to his person, medical and hospital expenses in the past,

14 past disability, past loss of use of the body, and past physical and mental pain and suffering; and

15 will incur in the future medical and hospital expenses, permanent disability, loss of use of the

16 body, physical and mental pain and suffering, and loss of the enjoyment of life.

17     112.    Plaintiff is therefore entitled to damages in an amount to be proven at trial,

18 together with interest thereon and costs.

19     113.    Defendants' conduct, as alleged above, was malicious, intentional and

20 outrageous and constituted willful and wanton disregard for the rights or safety of others.  Such

21 conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

22 **VII.    PRAYER FOR RELIEF**

23      WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

24     114.    For compensatory damages sustained by Plaintiff against Defendants in an

25 amount to be determined at trial;

26     115.    For punitive and exemplary damages according to proof against

27 Defendants;

28

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    116.    For an award of prejudgment interest, costs, disbursements and reasonable

2  attorneys' fees;

3    117.    For injunctive relief in the form of an order requiring Defendants to

4  preserve all relevant documents; and

5    118.    For such other and further relief as the Court deems equitable or

6  appropriate under the circumstances.

7

8  Dated:  May 16, 2007

9  _____
                                                    Heather A. Foster

10  Elizabeth J. Cabraser (California Bar No. 83151)
    Richard M. Heimann (California Bar No. 063607)
11  Heather A. Foster (California Bar No. 184353)
    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
12  275 Battery Street, 30th Floor
    San Francisco, CA  94111-3339
13  Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
14  E-mail: ecabraser@lchb.com, rheimann@lchb.com,
              hfoster@lchb.com
15
                                                    -and-
16
    Nicholas Diamand (New York Bar No. ND 9701)
17  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    780 Third Avenue, 48th Floor
18  New York, NY 10017-2024
    Telephone: (212) 355-9500
19  Facsimile: (212) 355-9592
    E-mail: ndiamand@lchb.com
20
                                                    -and-
21
    Lexi J. Hazam (California Bar No. 224457)
22  LIEFF GLOBAL, LLP
    275 Battery Street, 30th Floor
23  San Francisco, CA  94111
    Telephone: (415) 788-8000
24  Facsimile: (415) 788-8002
    E-mail: lhazam@lieffglobal.com
25
    Attorneys for Plaintiffs
26

27

28

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues stated.

Dated:  May 16, 2007

_____
Heather A. Foster

Elizabeth J. Cabraser (California Bar No. 83151)
Richard M. Heimann (California Bar No. 063607)
Heather A. Foster (California Bar No. 184353)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
E-mail: ecabraser@lchb.com, rheimann@lchb.com,
    hfoster@lchb.com

-and-

Nicholas Diamand (New York Bar No. ND 9701)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY 10017-2024
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
E-mail: ndiamand@lchb.com

-and-

Lexi J. Hazam (California Bar No. 224457)
LIEFF GLOBAL, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111
Telephone: (415) 788-8000
Facsimile: (415) 788-8002
E-mail: lhazam@lieffglobal.com

Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF